in this state, to discover that not a few of them arise out of disappointed expectations, which furnish the principal foundation for enterprises of this character, and which, when first undertaken, were equally as alluring and full of promise to the investors as the one we are now considering.

It is the undoubted policy of the law to foster and encourage every legitimate enterprise which is at all likely to prove advantageous to the general public; but, at the same time, it is the obvious duty of those upon whom the responsibility rests to exercise a wise discretion in these matters, to the end that one enterprise, however alluring it may seem, shall not be aided and encouraged at the expense of another, which is perhaps equally deserving. In the present instance this discretionary power has been exercised by the railroad commissioners in a manner to commend itself to our approval, and for that reason we feel constrained to refuse the certificate asked for from this court. Application denied, with costs.

FOLLETT and WARD, JJ., not voting.

HESKETH v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Third Department. January 25, 1899.)

1. INJURIES TO EMPLOYE—NEW DEVICES—UNKNOWN DANGERS—PRECAUTIONS.
An employé injured while using a new device as a result of a danger that was unknown when the device was constructed may recover by reason of the employer's negligence in failing to take reasonable precautions against unknown dangers, though he used every precaution which he knew was requisite.

2. SAME—EVIDENCE.
Defendant railroad company employed a skillful bridge constructor to design and take complete charge of the erection of a new device, consisting of a cabin extending 25 feet above the railroad track, and supported by a bridge-like structure, resting on iron legs imbedded in the ground. While plaintiff was in the cabin, engaged in the train-signal service, the cabin was blown over in a severe storm, which pulled one of the legs from the ground, and twisted the others, and plaintiff was injured. Held a question for the jury whether defendant had taken reasonable precautions against the unknown dangers incident to the use of the device.
Herrick, J., dissenting.

Appeal from trial term, Schenectady county.

Action by Thomas Hesketh against the New York Central & Hudson River Railroad Company. From an order setting aside the verdict, plaintiff appeals. Reversed on remittitur.

In the year 1892 the defendant established along the line of its road what is known as the "Block System" of signaling; and for that purpose it erected, or had erected, along its tracks, at intervals of 2½ miles, iron bridge-like structures, resting upon iron legs or supports, one at each corner, imbedded in the ground near the tracks, and which structures extended over and across the tracks in the manner of a bridge. On the top of this bridge, and at one end of it, was a cabin built of wood, within which the signal-man stood, and discharged the duties of his position. The plan of these structures was designed by a construction company known as the Hilton Bridge Company, who were engaged in the business of constructing bridges and viaducts and work of similar character. Its president was a civil engineer, who had been

engaged in the duties of his profession about 40 years,—engaged in the construction of railroads and the building of bridges. He was an engineer of high repute, and had held the office of state engineer of this state. The plan of these structures was devised by this president of the construction company, and was by him submitted to the chief engineer of the defendant, who suggested that the legs or posts upon which the bridge was supported, at the point where they were inserted in the ground, be surrounded by a wooden box, and that box filled with concrete. With this modification, which was agreed to by the president of the construction company, the plans were accepted, and the contract was thereupon made with the Hilton Bridge Construction Company for the construction and erection of these signal towers or bridges upon the plans prepared by it. The Hilton Bridge Company both constructed and erected all the bridges or signal towers, some 71 in number, taking complete and sole charge both of their construction and erection, the only thing done by the defendant being the selection of inspectors to inspect the quality of the iron used at the establishment from which the Hilton Bridge Company purchased such iron; the wages or salaries of such inspectors being paid, however, by the Hilton Bridge Company. It is unnecessary to give all the details of the construction of these structures. Suffice it to say that at the foot of each leg or post, and attached to it, was a rectangular piece of iron, three-eighths of an inch thick, and about 10 by 12 inches in area, which plate was bolted to a foundation stone, which was to be 18 by 24 inches. Around each leg, extending from the surface of the ground to this foundation stone, was a box 10 by 18 inches, filled with concrete; the distance between each of the legs, measured along the track, being about 9 feet from outside to outside. The bridge or truss supported upon these legs, and extending over the tracks, was made of angle iron. Upon such bridge was a wooden floor, covering its entire width, at one end being the cabin structure above referred to. The length of the structure was about 57 feet, the top of the bridge 25 feet 6 inches above the railroad tracks, and the top of the cabin 41 feet. All the structures were built upon the same plan. The legs or supports were not stayed in any manner with either wires, cables, or rods. The structure in which the plaintiff was injured was brought to the place where it was erected complete. The foundation stones were attached to the posts or legs, which were lowered into holes, prepared for them in an embankment, three or four feet deep, which embankment was composed of a sandy, gravelly soil. After the legs were lowered into the holes prepared for them, the earth was thrown back, and stamped down. The plans and use of these structures were new. On the 27th day of December, 1895, during a severe windstorm, the tower or bridge where the plaintiff was working was blown down; one of the posts, with the anchor stone and the box filled with concrete, was pulled out of the ground; the other posts were twisted and bent over; and the structure fell to the ground, greatly injuring the plaintiff. The plaintiff brought this action against the defendant, to recover damages for the injuries so received by him. The jury rendered a verdict in favor of the plaintiff, and against the defendant, for the sum of $20,000. The defendant "moved on the minutes that the verdict be set aside, and a new trial granted, upon the ground of the exceptions; that the verdict was contrary to law and the evidence, and the damages excessive." The motion was granted, upon the ground that the damages were excessive. After the entry of the order, the plaintiff applied to the trial justice for a modification thereof, so that the order would read that the order was granted solely on the ground that the damages were excessive, which application was denied; and, from the order setting aside the verdict, the plaintiff appeals to this court.

Argued before PARKER, P. J., and LANDON, HERRICK, and MERWIN, JJ.

Hastings & Schoolcraft and Alonzo P. Strong, for appellant.
Samuel W. Jackson, for respondent.

LANDON, J. Here was a new device,—a small house or cabin erected upon stilts, upon the top of an embankment of considerable

height, in the open country, and so rising above the embankment that its bottom was clear above the reach of passing trains. It was peculiarly exposed to the violence of the winds and storms. It was so constructed that its whole height and substance above the surface of the ground was, when subjected to the pressure of the wind, the long arm of a lever exerting its force to pry up the earth and stone that fixed and bound its shorter arm to and within the ground. This cabin was the post of the plaintiff's duty. Let it be conceded that this erection received, in its design, substance, and manner of construction, the careful consideration of experts in civil engineering and bridge construction, still this was the first of its kind; no experts in this identical class of structures were obtainable. The question is, who should take the risk of its practical test of storm-worthiness? Who should suffer if the breadth of its base was too narrow, the depths to which the supports were sunken into the ground too shallow, the anchorage of stone too light, the consistency or cohesion of the earth into which the supports were placed too sandy or too weak, the precautionary appliances of safety in the form of stays, braces, and lateral supports too few,—the mere laborer, whose knowledge could not attain to the range of any of these problems, and whose means were limited to his daily wages; or the railroad company, whose power compasses the knowledge of past experience, and which is able, in case such experience does not show the exact requirements of safety, to add such a margin of extra safeguards as shall secure it, if not beyond peradventure, at least to the extent of a reasonably cautious apprehension? The answer to this question depends upon the proper answer to be given to the further question: Did the railroad company use reasonable care in making and employing this device? This is to be answered in view of the absence of practical tests of this class of erections, their exposure to the violence of extraordinary storms, the presumed knowledge of the company of the operation of natural and mechanical forces, its duty to supplement the theoretical needs of safety by a liberal margin of safeguards against mistakes or underestimates, and the danger to which its employés would be exposed if the structure should be overthrown.

Now, it is plain that the tests of care which are applied to the construction of well-known structures, such as houses, scaffolds, bridges, and the ordinary tools and appliances of our various industries, are not adequate or fitting here, since experience has demonstrated the practicable requirements and limits of reasonable care respecting them. When, for the first time, the employer passes beyond the range of experience, and enters a new field of danger, the extent of the safeguards against which is not exactly known, reasonable care requires that he should provide a reasonable margin of safeguards against this unknown margin of danger. It is not a question whether new devices and experiments, with the view to the attainment of new factors of economy, efficiency, safety, or comfort, are not praiseworthy,—this is conceded,—but whether they who exploit them in the first instance, and place their employés in them as in a safe place to labor, and because of the lack of requisite

safeguards thus injure their employés, have exercised reasonable care. This is a question of fact to be resolved upon consideration of all the facts. The court cannot resolve it. The court cannot say as a matter of law that, when the requisite amount of care was known by the company to be unknown, the company used all that was requisite. It may be that the company used all that it knew to be requisite. But the company knew that it did not know what was actually requisite, and hence it knew that, if it only used all it knew to be requisite, it was liable to fall short in respect to the unknown quantity. Hence it was its duty to do more than its actual knowledge of what was requisite suggested, and to make reasonable provision against the unknown. If it did not do this, it failed in reasonable care. Whether it so failed was a question for the jury. The court cannot assume to know the unknown, and it is for the jury to draw the true inference of fact from the evidential facts, some of which point to one conclusion, and others to another. To say that the jury is unreliable in such cases is to attack the system.

The verdict is very large,—so large, indeed, as to suggest the idea that it is due in part to the supposed wealth of the defendant, and therefore to that extent excessive. I advise that it be reduced to $15,000, and that the order be: Order affirmed, with costs to abide the event, unless the.plaintiff stipulate within 20 days to reduce the verdict to $15,000, in which case the order is reversed, and the verdict is reduced to $15,000, and judgment for that amount directed thereon, with costs· below, but not of this appeal. All concur, except HERRICK, J., dissenting.

HERRICK, J. (dissenting). I feel compelled ·to dissent from the decision arrived at by the majority of the court, and from the reasons given therefor in the opinion of Mr. Justice LANDON. Without undertaking to review that opinion in detail, it seems to me that he is wrong in his assumption that the structure was entirely new; that is, new in the sense that new engineering and mechanical problems were to be considered in its construction. It seems to me very apparent that the same problems were presented for consideration that have to be considered in the erection of bridges, water towers, large windmills, and other like structures, and that civil engineers and those who have been engaged in building bridges as a profession were eminently fit and proper persons to have charge of the designing, construction, and erection of such structures.

The opinion states that "when, for the first time, the employer passes beyond the range of experience, and enters into a field of danger, the extent of the safeguards against which are not exactly known, reasonable care requires that he should provide a reasonable margin of safeguards against this unknown margin of danger," and concludes that whether the defendant had provided such a reasonable margin of safety was·for the jury to determine. The practical effect of that is to hold the defendant responsible for an error of judgment,—for a mistake as to what was necessary to be done. I have long understood the law to be that a person was not liable in an action of negligence for a mere error in judgment. Under this

ruling, if the engineers to whom was confided the designing, construction, and erection of these structures made a miscalculation in the design, or in the force of the wind to which the structure was to be exposed, no matter how carefully and conscientiously they endeavored to perform their duty, the defendant would be liable for that error and miscalculation. Indeed, the opinion substantially holds that even with the exercise of due care, if the structure failed in safety, the defendant would be liable, for the learned justice says: "Let it be conceded that this erection received, in its design, substance, and manner of construction, the careful consideration of experts in civil engineering and bridge construction, still this was the first of its kind; no experts in this identical class were obtainable. The question is, who should take the risk of its practical test of storm-worthiness?"—and then proceeds to hold, as before stated, that the defendant is liable, provided the jury find that, in the erection of this structure, the defendant did not allow sufficient margin of safety against unknown dangers. Submitting that question to the jury, under the circumstances and under the reasoning of this opinion, is to gauge the defendant's duty and responsibility by the view after the accident, and from what then for the first time appeared necessary to render the structure safe. The duty of the defendant is not to be "estimated by what, after the accident, then first appears to be a proper precaution against a recurrence of it." McGrell v. Building Co., 153 N. Y. 265, 47 N. E. 305; Burke v. Witherbee, 98 N. Y. 562.

What constitutes reasonable care in the use of new devices and experiences? Justice LANDON says that that "is a question of fact, to be resolved upon consideration of all the facts. The court cannot resolve it. The court cannot say as a matter of law that, when the requisite amount of care was known by the company to be unknown, the company used all that was requisite. It may be that the company used all that it knew to be requisite. But the company knew that it did not know what was actually requisite, and hence it knew that, if it only used all that it knew to be requisite, it was liable to fall short in respect to the unknown quantity. Hence it was its duty to do more than its actual knowledge of what was requisite suggested, and to make reasonable provision against the unknown. If it did not do this, it failed in reasonable care." If, as stated in the opinion, "the requisite amount of care was known by the company to be unknown," how in the world was the company to determine what amount of care it was requisite to take? The jury cannot act upon the knowledge gained from the accident itself, but, in determining what a reasonable and prudent man should do, must place itself in the same position the defendant was in when these structures were erected; and if the company did not know, and its engineers did not know, what was requisite, how and from what information is the jury to determine? How can it determine what reasonable precaution to take against an unknown danger? What is a reasonable precaution to take against something you know nothing about, and that you know you know nothing about? If the company did not know the danger or its extent,

how could it possibly know what margin of safety it was necessary to provide? It could, under such circumstances, have no knowledge of what it was reasonably requisite to provide against. It seems to me that the learned justice loses sight of the principle that one is only bound to provide against a known or reasonably to be apprehended danger. His reasoning seems, however, to lead to the reverse of that.

But assuming, as is stated in the opinion, that "the company knew that it did not know what was actually requisite," and that it was its duty "to make reasonable provision against the unknown," before any question can be submitted to the jury upon that question, there first comes the question of law to be determined by the court, as to whether there is sufficient evidence of a neglect of duty in that respect to submit to them for their consideration. And, in determining that question, we must, I think, a little more fully consider the defendant's duty, and the manner in which it may be discharged, than is considered in the prevailing opinion. If, as stated in that opinion, the defendant did not know what was requisite to insure safety, "and knew that it did not know," then it seems to me that if it turned the planning and doing of the work over to those who, by their special training and business, and reputation in such business, it would be reasonably presumed would be competent to determine what was necessary, and do it, the company would be doing what was reasonable and prudent. What more could the defendant do to insure the safety of its employé than to place the planning and construction of the structure in which he was to work in the hands "of experts in civil engineering and bridge construction," of high reputation and standing? The work to be done called for knowledge and ability of a kind possessed by civil engineers, and of the experience acquired in the building of bridges and similar structures. If, without knowledge of what was necessary, it had proceeded to the planning of the structures itself, or had employed men of known incompetency, or men of whose competency nothing was known, and of no reputation, and whose incompetency had been demonstrated by the structure in question, it would, under the law, as I understand it, have been justly chargeable with a neglect of duty. But when a person or corporation, in the course of his or its business, finds it necessary, proper, or convenient to construct or employ a device, whether new or old, and the planning or manufacture of such device is not a part of his or its business, and it employs others whose special knowledge, business, and training presumably fit them for the planning and construction of such device, and who have a good reputation in their calling and business, it seems to me that such person or corporation has fully discharged its duty; and the principles of the law of negligence and the adjudicated cases, I think, justify that conclusion. Let us consider such principles, and a few of the cases.

To sustain a judgment against the defendant, it must be shown that the defendant negligently did something that it ought not to have done, or negligently omitted to do something that it ought to have done, which act or omission to act caused or contributed to

the plaintiff's injury. I do not think it makes any difference whether we regard the bridge and tower which blew down as a place in which to work, or, like a scaffold or staging, an appliance with which to work. In the aspect which this case presents, the duty of the defendant is practically the same, whichever we regard it. Whether in furnishing a place in which, or tools or appliances with which, to work, the employer's or master's duty is substantially the same, and it is not an absolute one. "The master does not guaranty the safety of his servants. He is not bound to furnish them an absolutely safe place to work in, but is bound simply to use reasonable care and prudence in providing such place. He is not bound to furnish the best-known appliances, but only such as are reasonably fit and safe. He satisfies the requirements of the law if, in selection of machinery and appliances, he uses that degree of care which a man of ordinary prudence would use, having regard to his own safety, if he were supplying them for his own personal use. It is culpable negligence which makes the master liable, not a mere error of judgment." Harley v. Manufacturing Co., 142 N. Y. 31, 36 N. E. 813. "The law does not require him to guaranty the prudence, skill, or fidelity of those from whom he obtains his tools or machinery, or the strength or fitness of the materials they make use of. If he employs such reasonable care and prudence in selecting or ordering what he requires in his business, such as every prudent man is expected to employ in providing himself with the conveniences of his occupation, this is all that can be required of him." Cooley, Torts (1st Ed.) 557.

The duty of the master to furnish safe, suitable, and sound tools, machinery, and appliances for the use of the servant in the performance of his work, and to keep them in repair, is not an absolute one, and is satisfied by the exercise of reasonable care and prudence on the part of the master in the manufacture, selection, and repair of such appliances. Probst v. Delamater, 100 N. Y. 266, 3 N. E. 184. When a place in which the employé is to work has to be constructed for that purpose, the duty of the employer is likened to his duty in furnishing tools and machinery or appliances, and that, as we have seen, is not an absolute one. The duty that he owes is not always best fulfilled by manufacturing such tools, machinery, or appliances, or constructing and erecting such structures, himself. Sometimes to do so would be a manifestation of the lack of ordinary prudence,—indeed, would be an exhibition of gross negligence; particularly where such construction or manufacture requires skill, or the application of scientific knowledge, and the employer possesses neither. In such case he must employ or contract with some one who does possess, or whom he has good and sufficient reason to believe possesses, the requisite skill and knowledge. And while a great corporation like the defendant has facilities, through its own regular employés, for manufacturing or constructing many of its own tools, machines, appliances, and structures that a natural person does not possess, yet there are limitations upon its facilities, and it is not to be expected that it will make, manufacture,

or construct everything needed by it in the conduct of its business; and, like individuals, it may, under certain limitations, purchase tools and appliances, or contract for the construction of machinery or structures, needed by it. And when tools or necessary manufactured articles are purchased from reputable dealers or manufacturers, and an accident happens through some defect in them, which the purchaser neither knew nor should have known, such purchaser is not responsible for the resulting injury.

The case of Doyle v. White, 9 App. Div. 521, 35 N. Y. Supp. 760, and 41 N. Y. Supp. 628, was one where the plaintiff was working at the top of a high pole. A wire extended from this pole to another pole. The wire was drawn tight, so that the tops of the poles were drawn towards each other. The wire was attached to eyebolts. One of the eyebolts broke, causing a jarring of the pole, which threw the plaintiff to the sidewalk. The eyebolt had been purchased from a reputable firm. It had no defect which could be detected by an external examination, but it had been welded together, and parted at the place of welding. The court said: "It appearing that the defect in the bolt was one which could not be detected upon an external examination, the defendant was shown to have done all that the rules of law required him to do."

While a master or employer may not shirk his responsibility, by employing or contracting with others to do that which he ought to do himself, yet when such thing is something which requires special skill or knowledge, or is the subject of a separate trade, pursuit, business, profession, or employment, he may properly make an independent contract for the doing of such thing; and, if he makes his contract with those whom he has good and sufficient reasons to believe possess the necessary qualifications to properly fulfill it, he is not responsible for any injury resulting from their negligence to his employés or servants. "Where the negligence which causes the injury is the negligence of an independent contractor, the person employing such contractor is not responsible for his negligence." Roemer v. Striker, 142 N. Y. 134, 36 N. E. 808. See, also, Berg v. Parsons, 156 N. Y. 109, 50 N. E. 957. Of course, this general rule last quoted is subject to qualifications. The employer or master cannot relieve himself by employing or contracting with known incompetent persons; but when such contract is with those whose known and peculiar business it is to do such work, or reputed to be skilled in that particular calling, then such general rule applies in its full force.

The case of Butler v. Townsend, 126 N. Y. 105, 26 N. E. 1017, was a case where the plaintiff's intestate had been injured by the fall of the staging upon which he was at work, calking a vessel. The staging had been erected under a contract with an independent gang of men, known as "lumpers," whose business it was to erect staging upon which the calkers worked. And it was held that the defendant was not responsible; that a master who places his servants upon a scaffold, for the construction of which he had contracted with a skillful and experienced builder, is not liable for ·

any injury resulting from negligence in its construction; that he is at liberty to accept it without inspection.

The case of Devlin v. Smith, 89 N. Y. 470, was one where the plaintiff was injured by reason of a defective scaffold. The defendant Smith had made a contract to paint the interior dome of a court house, and the plaintiff's intestate was a workman employed by him upon that work. Smith did not undertake to build the scaffold himself, or by means of the services of workmen under his direction, but made a contract with the defendant Stevenson to erect the structure for a gross sum; and the work was done under that contract, by Stevenson, who employed his own workmen, and superintended the job himself. Mr. Stevenson had been known to Smith as a scaffold builder for many years. His experience had been very large, and Smith had employed him before. There was no evidence upon which to base any allegation of incompetency on the part of Stevenson, nor any charge of negligence on the part of Smith in selecting him as contractor; nor was there any evidence to show that Smith knew, or had reason to know, of any defect in the scaffold. Upon the trial the complaint was dismissed, and upon appeal the judgment was affirmed as to the defendant Smith, and reversed and a new trial ordered as to the defendant Stevenson, the court holding that Smith was not liable, that there was no negligence shown on his part, saying:

"It may be that, if Smith had undertaken to erect the scaffold through agents or workmen acting under his direction, he would have been liable for negligence on their part in doing the work, provided that in doing it they were not fellow servants of the party injured. But in this case he did not so undertake. Stevenson was not the agent or servant of Smith, but an independent contractor, for whose acts or omissions Smith was not liable. Smith received the scaffold from him as a completed work, and we do not think it was negligence to rely upon its sufficiency, and permit his employés to go upon it for the purpose of performing their work. Stevenson was, as appears from the evidence, much more competent than Smith to judge of its sufficiency. He had undertaken to construct a first-class scaffold, and had delivered it to Smith in performance of this contract; and we do not think that Smith is chargeable with negligence for accepting it without further examination."

The structure in question here presents many of the features of a bridge. Its strength and power of resistance to the wind present much the same problems that are presented in the construction of a bridge, whose solution requires a considerable—indeed, so far as I can gather from the case, a high—degree of scientific knowledge. Its construction and erection is peculiarly one of those cases where an employer or master is at liberty, within his duty,—if, indeed, he does not so best discharge it,—to enter into a contract with proper persons for its doing. We need not enter into an examination here as to the duty of a master as to a completed structure, to be thereafter used or occupied by an employé or servant, as to whether it has been properly put together, made of proper materials, and kept in proper condition. No contention is made in this case as to any of those things. The objection made is that the plan of the structure was faulty. The plan was not made by the defendant;

but was the work of the Hilton Bridge Company, as well as the work of construction and erection.

In the case of Burke v. Ireland, 26 App. Div. 487, 50 N. Y. Supp. 369, the employé of a contractor, was injured by the collapse of a building in course of erection. The defendant had employed an architect to prepare the plans and specifications, and the building was being erected pursuant to such plans and specifications. On the trial, evidence was given tending to show that the plans and specifications were defective, and that a building erected in accordance with them would not be reasonably safe, and the court said:

"We think that in such a case, where the owner employed a competent and skillful architect to design the building, he is not responsible, to employés of contractors who agree to erect the building according to such design, for faults or defects in the design, of which he neither knew nor should have known. Of course, to relieve the owner from liability, it must appear that he fairly committed the subject-matter to the architect, and that the deficiencies or defects did not proceed from his interference or direction."

While, in this case, the plan of the structure was submitted to the defendant's engineer, and he suggested an addition intended to increase the stability of the structure, which suggestion was adopted by the Hilton Bridge Company, still it was the design and plan of the Hilton Bridge Company; and its submission to the defendant's engineer was in the same way that an architect submits his plans to one proposing to build.

In Devlin v. Smith, 89 N. Y. 476, it was said, "Personal negligence is the gist of the action." That applies as well to corporations as to natural persons. In the case of corporations, it is the personal negligence of those charged with the management of its affairs, who do that for the corporation that a natural person does or should do for himself. The defendant did not make the plan of the signal station itself. There is, and from the evidence there can be, no claim that the defects complained of proceeded from its interference or direction. It employed a company that was engaged in business of a like character to that of building such structures. Its president, who actually made the plans, was a civil engineer of high repute and large experience. The whole matter was fairly committed to him and the company of which he was president. It seems to me, therefore, that it did what an ordinarily prudent man, having a due regard for his own safety, and intending to personally occupy the structure, might well have done; and it is not, therefore, chargeable with negligence.

Having reached that conclusion, it is unnecessary to consider the question of damages. The order setting aside the verdict and for a new trial should, however, have provided for the payment of costs by the defendant, and should be so modified, and, as modified, affirmed, without costs of this appeal to either party.